51 F.3d 267
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Roy Allen MURRAY, Plaintiff-Appellant,
v.
Donna E. SHALALA, Secretary of Health and Human Services,
Defendant-Appellee.
 No. 94-2039.
 United States Court of Appeals, Fourth Circuit.
 Argued: February 3, 1995.
Decided: March 31, 1995.
 
 ARGUED: Ervin W. Bazzle, BAZZLE, CARR & GASPERSON, Hendersonville, NC, for appellant. James Michael Sullivan, Assistant United States Attorney, UNITED STATES ATTORNEY'S OFFICE, Charlotte, NC, for appellee. ON BRIEF: Mark T. Calloway, United States Attorney, Clifford C. Marshall, Assistant United States Attorney, Asheville, NC, for appellee.
 Before NIEMEYER, MICHAEL, and MOTZ, Circuit Judges.
 OPINION
 PER CURIAM:
 
 
 1
 Roy Allen Murray appeals from an order affirming the decision of the Secretary of Health and Human Service to deny Murray social security disability benefits. Because there is substantial evidence to support the Secretary's decision, we affirm.
 
 I.
 
 2
 Murray injured his back while at work on October 14, 1990 and has not worked since that date. When conservative treatment failed to improve his condition, on December 24, 1990 an MRI of his lumbar spine was performed that revealed an L5 disk herniation. Three days later, Dr. Frank M. Brown noted "marked tenderness" in the spine "with associated spasm and limited motion" and prescribed a course of care that included "bedrest," "remain[ing] off work," and two "[e]pidural steroid injections." On January 17, 1991, Dr. Brown noted "moderate tenderness" in the spine and that Murray "has a very heavy job which requires working on conveyors and doing pipe fitting work. He is certainly not ready to return to that degree of activity." Dr. Brown prescribed that Murray "[r]emain off work, get the third epidural steroid injection and followup ... in 2 weeks." In accordance with Dr. Brown's treatment plan, Murray was next seen by Dr. Brown, on February 4, 1991. At that time, Dr. Brown noted that "[t]he third epidural injection did not seem to help much" and that "the back remains quite sore." Dr. Brown further noted "decreased sensation of the lateral border of the left foot," "left buttock discomfort," and "suppressed" reflex in the left ankle. Dr. Brown stated that Murray was "to stay out of work, remain at relative bedrest, [and to] use his corset what little time he is up."
 
 
 3
 On February 28, 1991 Murray was again seen by Dr Brown. During that visit Dr. Brown noted that "75% of his [Murray's] leg pain [wa]s gone;" but that there was still "slight decreased sensation in the lateral border of the left foot." Dr. Brown stated that he would "allow return to light work on 4 March," but imposed the following restrictions: "[n]o climbing, bending, pulling, pushing or lifting greater than 20 lbs" for three weeks, with "[f]ollowup in 3 weeks." Three weeks later, on March 21, 1991, when Dr. Brown next saw Murray, he noted that "[t]he company would not allow him[Murray] to return to work with restrictions." Dr. Brown further noted that Murray had "slight left leg pain with increased activity" and that he would "allow trial return to regular job on Monday, 25 March, 1991."
 
 
 4
 Murray did not return to work, nor did he return to Dr. Brown. Instead, Murray began seeing a chiropractor, Dr. John G. Watson, on March 25, 1991. Dr. Watson reported that Murray was "pain free" by April 15, 1991 but thought it was "very questionable that he will be able to return to his former type of work w/o reinjuring himself" and accordingly, "recommended ... a change in employment." On November 13, 1991, Dr. Watson reported that Murray had experienced "no pain for six and a half months" but reiterated his view that Murray should "not return to the type of work he was doing."
 
 
 5
 On November 18, 1991, Dr. Watson filled out an "Attending Physician's Statement of Disability" claim for Murray. In that form, Dr. Watson noted that Murray had "[i]mproved" and was "[a]mbulatory" and, as of that date--November 18, 1991--Murray was not totally disabled. In apparent contradiction with this statement, Dr. Watson at this same time listed the "inclusive dates of disability" as November 4, 1991 to December 14, 1991.[1] In addition, Dr. Watson indicated that he "expect[ed] a fundamental or marked change in the future;" that "job modification would enable patient to work with impairment;" and that "trial employment" with appropriate job modification could commence on January 1, 1992.
 
 
 6
 On December 30, 1991 Murray was seen by Dr. Ralph C. Loomis, a neurologist. Dr. Loomis noted "dramatic improvement" in Murray's left leg pain, "to the point where now he [Murray] has absolutely no complaints of any pain out into the left leg." Dr. Loomis noted that Murray's "main complaints are those of low back and lateral left flank pain radiating into the left groin and down into the left testicle." Upon examination, Dr. Loomis found that Murray's "[r]ange of motion of the back" was "somewhat limited upon left lateral bending." He observed "no atrophy in the lower extremity musculature," normal flexion, "brisk" ankle and knee jerks, and "no pathological reflexes."
 
 
 7
 On January 10, 1992 Dr. Watson stated in a letter to Dr. Leslie Bryan that Murray was "still unfit for any gainful employment."[2] Dr. Watson referred Murray to Dr. Daniel Veazey because Dr. Watson felt that Murray was not responding to his treatment. A CT scan ordered by Dr. Veazey revealed a large renal cell carcinoma. On March 20, 1992, Mr. Murray underwent a "[r]ight radical nephrectomy with excision of intracaval and intra-atrial tumor thrombus using deep hypothermia and circulatory arrest." Murray was discharged from the hospital on March 30, 1992. On March 31, 1992 Dr. Veazey's notes reflect that he "called Roy to see how he is doing." Dr. Veazey noted that he was "doing great" and that Murray "[s]aid they cured his cancer."
 
 
 8
 Approximately eight months later, on November 20, 1992, Dr. Loomis saw Murray and reported Murray no longer had "left leg pain;" "his reflexes are brisk and equal;" "[p]inprick sensation is normal;" "[t]here are no motor deficits;" and there was "mild tenderness over the L4-L5 spinous process in the midline." Dr. Loomis recommended that Murray "not return to his former occupation anytime in the future" and that "he be retrained in some other type of work such as real estate or retail work."
 
 
 9
 On April 30, 1993 Steven Carpenter conducted a "Vocational Assessment." He determined that because of Murray's "severe limitations" his skills were "not transferable within his functional ability." Carpenter noted the conflicting opinions of Dr. Loomis and Dr. Watson concerning Murray's work capacity, credited Dr. Watson's opinion and accordingly concluded that Murray was "not employable."
 
 
 10
 Murray applied for benefits under the Social Security Disability Insurance Program, 42 U.S.C. Sec. 423 (West 1991), on September 21, 1992. After his application and request for reconsideration were denied, Murray requested a hearing before an administrative law judge. The ALJ issued an order and opinion denying Murray disability insurance and the Appeals Council denied Murray's request for review of that order. Murray filed suit on November 23, 1993 in the United States District Court for the Western District of North Carolina, Asheville Division. By an order dated July 8, 1994, the magistrate judge denied Murray's motion for summary judgment, granted the Secretary's motion and so affirmed the Secretary's decision to deny Murray benefits.
 
 II.
 
 11
 We review the Secretary's decision to determine whether the factual findings are supported by substantial evidence and whether correct legal standards were applied. See Richardson v. Perales, 402 U.S. 389, 390 (1971); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir.1990); 42 U.S.C. Sec. 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 401 (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). It is not the role of this court to reweigh the evidence or substitute our judgment for that of the Secretary. Hays, 907 F.2d at 1456.
 
 A.
 
 12
 Murray's first argues that he "meets the listing set forth in Appendix I of the Social Security Regulations, and based on this impairment, is entitled to Disability Insurance Benefits." The Secretary concedes that Murray "has shown he has a listed diagnosis," but contends that Murray "has not presented medical evidence of the findings set forth within listing 1.05C."[3]
 
 
 13
 The ALJ found that "the record does not document an impairment or combination of impairments which actually meet or equal an impairment listed in Appendix 1, Subpart P, Regulation No. 4." 20 C.F.R Sec. 404.1520(d) provides: "If you have an impairment(s) which meets the duration requirement and is listed in appendix 1 or is equal to a listed impairment(s), we will find you disabled without considering your age education and work experience." The relevant criteria for a listed impairment in the present case require that both of the following must "persist[ ] for at least 3 months despite prescribed therapy and expect to last 12 months":
 
 
 14
 1. Pain, muscle spasm and significant limitation of motion in the spine; and
 
 
 15
 2. Appropriate radicular distribution of significant motor loss with muscle weakness and sensory reflex loss.
 
 
 16
 20 C.F.R. Sec. 404, Appendix 1, Subpart P, Sec. 1.05.C. Murray asserts that for three months after therapy ended in January 1992, he suffered a listed impairment set forth in Appendix I or its equal.
 
 
 17
 In fact, the overwhelming weight of the medical evidence from this period concerns diagnosis and treatment of Murray's renal cell carcinoma. While this condition was clearly serious, it does not constitute a listed muscoskeletal impairment under Sec. 1.05C. The only evidence in the record that refers to Murray's back pain in January 1992 is a January 10, 1992 letter from Dr. Watson to Dr. Bryan. Dr. Watson's letter does not describe "[p]ain, muscle spasm, and significant limitation of motion in the spine; and ... significant motor loss with muscle weakness and sensory and reflex loss," let alone support such findings with the necessary evidence. See 20 C.F.R. Sec. 404, Appendix 1, Subpart P, Sec. 1.00B. Immediately prior to January 1992, on December 30, 1991 Murray was seen by Dr. Loomis who noted that Murray had "absolutely no complaints of any pain out into the left leg," "no atrophy in the lower extremity musculature," normal flexion, "brisk" ankle and knee jerks, and "no pathological reflexes." These notes provide substantial evidence that Murray did not meet the requirements of a listed impairment on December 31, 1991. In the absence of medical evidence to the contrary, the only reasonable conclusion is that, contrary to his assertion, Murray did not have a listed impairment or its equivalent in January 1992.
 
 
 18
 Similarly, we are unable to identify any other three month period during which Murray met the requirements for a listed impairment. By February 28, 1991, less than three months after Murray's injury, Dr. Brown noted that "75% of his [Murray's] leg pain [wa]s gone;" and that he had "slight decreased sensation in the lateral border of the left foot." Dr. Brown stated that he would "allow return to light work on 4 March," with the following restrictions: "[n]o climbing, bending pulling, pushing or lifting greater than 20 lbs" for three weeks, with "[f]ollowup in 3 weeks." Murray's condition improved to the point that Dr. Watson, upon whose opinion, Murray relies greatly, stated that Murray was "pain free by April 15, 1991." Similarly, Dr. Watson stated on November 13, 1991 that Murray had experienced "no pain for six and a half months."
 
 
 19
 Furthermore, there was substantial evidence to support the Secretary's finding that Murray neither had nor has "an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4." See Bradford v. Secretary, HHS, 803 F.2d 871, 873 (6th Cir.1986) ("In order for the plaintiff to have met the above listings, the ALJ would have had to credit all of plaintiff's subjective testimony and further credit only such medical testimony as is supportive of plaintiff's contentions. This the ALJ is not required to do."). The medical evidence post-dating January 1992 focuses almost exclusively on Murray's cancer. In addition, there is little question that Murray did not satisfy the requirements for a listed impairment on November 20, 1992. Dr. Loomis' notes from that date reflect: that "Mr. Murray returns to the office today, no longer having any left leg pain;" that "his reflexes are brisk and equal;" that "[p]inprick sensation is normal;" that "[t]here are no motor deficits;" and that there was "mild tenderness over the L4-L5 spinous process in the midline."
 
 B.
 
 20
 Murray's next argues that "the evidence of record demonstrate[d] that [he] was disabled due to a non-exertional impairment, pain, and that disability benefits should have been awarded on this basis." Although Murray contends that the ALJ "failed to properly address and give proper weight to the testimonial and medical evidence of the presence of pain," he points to no medical evidence that establishes that his pain was disabling. Instead, he relies on his own testimony and that of his wife. Murray does not contend that the ALJ ignored this testimony. Indeed, he acknowledges that the ALJ "considered ... subjective assertions of pain" and found that these "subjective complaints of pain ... [we]re not credible in establishing pain of a 'disabling' degree in this case." Instead, Murray asserts that "there was no evidence whatsoever in the record to contradict or dispute" his testimony or that of his wife.
 
 
 21
 In fact, Murray's testimony that "on a continuous basis" he felt pain that "runs down in my leg and into my foot" is directly contradicted by Dr. Loomis' statements, that on December 31, 1991 Murray had "absolutely no complaints of any pain out into the left leg," and that on November 20, 1992, he "no longer ha[d] any left leg pain." Accordingly, this is not a case where "[t]he subjective evidence of pain ... is uncontradicted in the record." Thorne v. Weinberger, 530 F.2d 580, 582 (4th Cir.1976). Nor is this a case where the ALJ improperly required objective medical evidence that established the degree of pain. See Jenkins v. Sullivan, 906 F.2d 107, 109 (4th Cir.1990). In fact, the ALJ noted that "the absence of objective medical evidence of the intensity, severity, degree or functional effect of pain is not determinative." The ALJ properly considered Murray's "medications and treatment history," Hunter v. Sullivan, 993 F.2d 31, 36 (4th Cir.1993), as well as his "functional restrictions and daily activities," Mickles v. Shalala, 29 F.3d 918, 921 (4th Cir.1994), before concluding that Murray had no "medical condition which could reasonably be expected to cause the claimant 'disabling' pain." See Hyatt v. Sullivan, 899 F.2d 329, 337 (4th Cir.1990) (Hyatt III ).
 
 C.
 
 22
 Murray further contends that "the ALJ should have better analyzed how the added impairment of cancer and the resulting surgery affected his back impairment in determining whether Appellant was disabled."[4] Murray does not assert that the ALJ was unaware of his cancer and surgery, or that he mistakenly believed that each impairment alone had to establish a disability. In fact, Murray recognizes that the ALJ found Murray did "not have an impairment or combination of impairments" sufficient to establish a disability.
 
 
 23
 The vast majority of the testimony elicited from Murray by his lawyer in the hearing in front of the ALJ concerned his back and leg pain caused by his injury on October 14, 1990. Murray's attorney asked only one question concerning the diagnosis, treatment, and limitations imposed by his other "physical problem." Murray responded:
 
 
 24
 [A]bout a year after I hurt my back I got cancer in my right kidney which ran up through my arteries into my heart ... [they] operated on me and took my right kidney out, cut my heart. I had open heart surgery and they took my--the carcinoma out of my heart ... and I've got a real shortness of breath since I've been operated on my heart. I can't hardly--I can't do too much moving at all until I, until I'm breathing hard from I guess it's my heart operation that caused it.... I hurt some in my chest where I'm wired together where they cut me from my throat to my testicles and I have a lot of problems hurting in that area.
 
 
 25
 Murray further testified that he "wake[s] up with pain during the night. Either my back or chest bone ... the pain, I get nauseous, you know, like I'm going to throw up and that goes on practically every night." Thus, Murray's testimony, at most, is that he experiences more pain and shortness of breath as a result of his cancer and corresponding surgery. The ALJ did not ignore this testimony. The ALJ considered all the medical evidence as well as the testimony at the hearing and found that Murray's "pain does not prevent him from performing sedentary work on a sustained basis." This conclusion is supported by substantial evidence.
 
 D.
 
 26
 Finally, Murray argues that the ALJ improperly decided that he was able to perform alternative available work and so he was not disabled. Pursuant to 20 C.F.R. Sec. 404.1520, the ALJ engaged in a sequential evaluation in determining whether Murray was disabled. After finding that Murray was "unable to return to his past relevant work," the ALJ recognized that "the burden shifts to the Secretary to show that there are other jobs existing in significant numbers in the national economy which he can perform consistent with his medically determinable impairments, functional limitations, age, education, and work experience." See, e.g., Coffman v. Bowen, 829 F.2d 514, 518 (4th Cir.1987).
 
 
 27
 Murray asserts that the ALJ improperly employed the vocational guidelines in this case because, "vocational expert testimony is necessary if alternative employability is to be shown in cases where there is a nonexertional impairment." Although we have, on occasion, required the testimony of a vocational expert to evaluate the effect of nonexertional impairments on an disability applicant's work capabilities, see Wooldridge v. Bowen, 816 F.2d 157, 161 (4th Cir.1987) (vocational expert necessary to evaluate work capacity of claimant with environmental restriction of intolerance to fumes, dust, humidity, and temperature extremes), we have also indicated that "proper reference to the medical vocational guidelines" is an acceptable means of showing that a claimant can perform alternative work. See Coffman, 829 F.2d at 518. When a claimant, like Murray, has both exertional and nonexertional impairments, "the guidelines are not to be treated as conclusive." Id. Instead, an ALJ must take into account a claimant's nonexertional impairments and consider how those impairments affect the outcome that the vocational guidelines provide. The ALJ is particularly competent to make that evaluation when, as in the present case, the claimant's main nonexertional impairment is subjective pain.
 
 
 28
 The ALJ determined that Murray's residual functional capacity limited him to a "sedentary level of exertion," and that Murray was a " 'younger individual' " with a " 'limited education' " and "no transferable skills." The ALJ found: "Considering only the claimant's exertional limitations in this case, the pertinent findings would coincide with Rule 201.19. This Rule directs a conclusion that the claimant is not disabled." The ALJ did not base his decision solely on the grid determination, however. He further stated that Murray had nonexertional impairments but that they did "not compromise his capacity for sedentary work activities to a 'disabling' degree." The ALJ thus concluded, using the guidelines "as a framework for decisionmaking" that Murray was " 'not disabled,' within the meaning of the Social Security Act." The ALJ's use of the vocational guidelines was wholly appropriate. See 20 C.F.R. Sec. 404, Appendix 2, Subpart P, Sec. 200.00(e)(2).[5]
 
 
 29
 Accordingly, the decision of the Secretary is
 
 
 30
 AFFIRMED.
 
 
 
 [1]
 It is impossible that Murray was both not totally disabled on November 18, 1991 and totally disabled from November 4, 1991 to December 14, 1991. Moreover, it would require psychic skills to predict on November 18 Murray's condition on December 14
 
 
 [2]
 Dr. Bryan was apparently employed by Murray's insurance company. On that same date, January 10, 1992, Dr. Watson expressed a similar opinion--that Murray could neither return to his former job nor return to other work pursuant to restrictions--in a form to Murray's insurance company
 
 
 [3]
 20 C.F.R Sec. 404.1525(d) provides: "We will not consider your impairment to be one listed in appendix 1 solely because it has a diagnosis of a listed impairment. It must also have the findings shown in the Listing of that impairment."
 Furthermore, Section 1.00 of Appendix 1 provides that findings "must be established on the basis of adequate history, physical examination, and roentgenograms [x-rays]," and sets out rigorous requirements for history and physical examination findings.
 
 
 [4]
 It is not clear whether Murray made this argument below. Although there are some references to his cancer in his memorandum in support of his motion for summary judgment, Murray's complaint did not allege that the ALJ's decision was wrong because it failed to consider the cumulative effect of the cancer and the herniated disk. In the interest of completeness, we address it here
 
 
 [5]
 Murray's remaining arguments: that the ALJ "ignored the findings of the vocational expert," did not address the fact "that Appellant has only a tenth grade education, and has a limited ability to read and write," "failed to consider Appellant's advanced age (45 as of the date of hearing)," and made an "erroneous assumption about Appellant's level of pain," are contrary to the facts and without merit